**THIRD DIVISION**
**DILLARD, J.**
**MCFADDEN and PETERSON, JJ.**

NOTICE: Motions for reconsideration must be *physically received* in our clerk's office within ten days of the date of decision to be deemed timely filed.
http://www.gaappeals.us/rules

**February 23, 2016**

# In the Court of Appeals of Georgia

A15A2111. KENDRICK v. THE STATE.                                    PE-028C

PETERSON, Judge.

In this interlocutory appeal in a DUI prosecution, Lisa Kendrick argues that the trial court erred in denying her motion to suppress breathalyzer evidence showing she had a blood alcohol content of .15 because she did not freely and voluntarily consent to the breath test under our Supreme Court's recent precedent in *Williams v. State*, 296 Ga. 817 (771 SE2d 373) (2015). Because we find the trial court properly considered the totality of the circumstances in finding that Kendrick consented to her breath test, we affirm.

"On appeal from a ruling on a motion to suppress, we construe the evidence most favorably to affirming the trial court's factual findings and judgment." *See Brooks v. State*, 285 Ga. App. 624, 626 (647 SE2d 328) (2007). So viewed, the facts

show that on May 24, 2014, an officer pulled Kendrick over for failing to stop at a stop sign and maintain her lane. The officer conducted several field sobriety tests on Kendrick. Although Kendrick generally performed well on most of the tests, her performance on one test[1] indicated a possibility of intoxication. The officer placed Kendrick under arrest and handcuffed her. The officer then read Kendrick the standard implied consent notice for suspects 21 or over from a prepared card, which stated:

> Georgia law requires you to submit to state administered chemical test of your blood, breath, urine, or other bodily substances for the purpose of determining if you are under the influence of alcohol or drugs. If you refuse this testing, your Georgia driver's license or privilege to drive on the highways of this state will be suspended for a minimum period of one year. Your refusal to submit to the required testing may be offered into evidence against you at trial. If you submit to testing and the results indicate an alcohol concentration of 0.08 grams or more, your Georgia driver's license or privilege to drive on the highways of this state may be suspended for a minimum period of one year. After first submitting to the required state test, you are entitled to additional chemical tests of

[1]Video evidence from the traffic stop shows that Kendrick appears to have also blown a positive preliminary alcohol screen, though this fact was not mentioned by either of the parties below or on appeal. Although the video in which it appears is part of the record on appeal, we decline to afford it weight in the absence of argument from the parties as to its significance. Our analysis would be no different, however, if we did consider it.

the blood, breath, urine, or other bodily substances at your own expense and from qualified personnel of your own choosing. Will you submit to the state administered chemical test of your breath under the implied consent law?[2]

Kendrick replied "yes" and made no other comments, did not ask any questions about the implied consent notice or chemical breath test, and did not request an attorney. Kendrick was subsequently transported to jail and approximately twenty minutes later provided a breath sample for testing. Kendrick's breath test showed that her blood alcohol content was .15, nearly twice the legal limit.

Kendrick filed a motion to suppress challenging her arrest and all evidence obtained against her, asserting that (1) the officer lacked probable cause for the stop, (2) the officer exceeded the duration, intent, and scope of the initial stop, (3) she was not read her *Miranda* rights, and (4) she did not freely and voluntarily consent to a test of her breath as required under *Williams*. Following an evidentiary hearing focused only on the *Williams* issue, and at which Kendrick and the arresting and testing officers testified, the trial court denied Kendrick's motion to suppress. In particular, the trial court found that "under a totality of the circumstances," Kendrick

---

[2]The specific language of this notice appears verbatim in OCGA § 40-5-67.1(b)(2).

voluntarily consented to giving a breath sample. The trial court credited testimony by officers that Kendrick, in the trial court's words, "appeared coherent, her language and speech patterns were normal, . . . she appeared to understand what was going on[,]" and did not otherwise appear confused. The trial court also viewed the video of the arrest, including where the officer read Kendrick the implied consent notice, and noted that Kendrick exhibited "no slurred speech, no odd behavior," "rational and good communication skills with the officers[,]" no "extreme intoxication[,]" and that the officer did not point any weapon at Kendrick or use force, threats, or promises, which the court said was consistent with witness testimony. Similarly, there was no testimony that any force or threats were used in the testing room.

On appeal, Kendrick challenges the denial of her motion to suppress, focusing her argument on her claim that she did not consent to the breath test. She asserts that the trial court erred by finding that Kendrick freely and voluntarily consented to a test of her breath under the Georgia Supreme Court's recent decision in *Williams*. Indeed, the parties appear to agree on all the relevant facts and evidence, and are in accord that the sole issue before this court to resolve is whether Kendrick freely and voluntarily consented to a breath test as required under *Williams*. "Consequently, we review the trial court's application of the law to the facts de novo, examining the

4

entire record and making an independent determination of the ultimate issue of voluntariness." *State v. Fulghum*, 261 Ga. App. 594, 594 (1) (583 SE2d 278) (2003) (citation omitted).

The Fourth Amendment of the United States Constitution and Article I, Section I, Paragraph XIII of the Georgia Constitution both protect an individual's right to be free of unreasonable searches and seizures, and apply with equal force to the compelled withdrawal of blood, breath, and other bodily substances. *See Williams*, 296 Ga. at 819; *Cooper v. State*, 277 Ga. 282, 285 (587 SE2d 605) (2003); *Lutz v. State*, 274 Ga. 71, 72 (1) (548 SE2d 323) (2001); *State v. Johnston*, 249 Ga. 413, 414 (2) (291 SE2d 543) (1982); *Davis v. State*, 332 Ga. App. 488, 490 (773 SE2d 442) (2015). Because a breath test is a search within the meaning of the Fourth Amendment, absent a warrant, the State must show that it falls into one of the "specifically established and well-delineated exceptions" to the warrant requirement. *Williams*, 296 Ga. at 819.

Consent is a valid basis for a warrantless search where it is given freely and voluntarily, and the State does not argue that any other exception might apply. *Id.* at 821. Therefore, the only question in regard to the validity of the search is whether the

State met its burden of proving that Kendrick actually consented "freely and voluntarily under the totality of the circumstances." *Id.*

Historically, we considered a defendant's affirmative response to the reading of the implied consent notice as sufficient to allow a search of his or her bodily fluids without further inquiry into the validity of the defendant's consent. *See, e.g.*, *Meiklejohn v. State*, 281 Ga. App. 712, 714 (637 SE2d 117) (2006); *State v. Lewis*, 233 Ga. App. 390, 392 (1) (504 SE2d 242) (1998). However, *Williams* rejected this per se rule automatically equating an affirmative response to the implied consent notice with actual consent to a search within the meaning of the Fourth Amendment. *Williams*, 296 Ga. at 821-22. Instead, courts must now conduct a case-by-case analysis, considering the totality of the circumstances. *Id*.

A "totality of the circumstances" analysis is not new to Georgia courts. "A consent to search will normally be held voluntary if the totality of the circumstances fails to show that the officers used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent." *Cuaresma v. State*, 292 Ga. App. 43, 47 (2) (663 SE2d 396) (2008). Nor may consent be "coerced, by explicit or implicit means, by implied threat or covert force." *Schneckloth v. Bustamonte*, 412 U.S. 218, 228 (II) (B) (93 SCt. 2041, 36 LEd 2d 854) (1973). Other factors to be considered are

6

"prolonged questioning; . . . the accused's age, level of education, intelligence . . . and advisement of constitutional rights; and the psychological impact of these factors on the accused." *State v. Austin*, 310 Ga. App. 814, 818 (1) (714 SE2d 671) (2011). Moreover, "[w]hile knowledge of the right to refuse consent is one factor to be taken into account, the government need not establish such knowledge as the sine qua non of an effective consent." *Schneckloth*, 412 U.S. at 227 (II) (B). Instead, the court should consider whether "a reasonable person would feel free to decline the officers' request to search or otherwise terminate the encounter." *Austin*, 310 Ga. App. at 820 (1) (citing *Johnson v. State*, 297 Ga. App. 847, 849 (678 SE2d 539) (2009)); *State v. Durrence*, 295 Ga. App. 216, 218 (671 SE2d 261) (2008). "Mere acquiescence to the authority asserted by a police officer cannot substitute for free consent." *State v. Jourdan*, 264 Ga. App. 118, 121 (1) (589 SE2d 682) (2003) (internal citation omitted); *Hollenback v. State*, 289 Ga. App. 516, 519 (657 SE2d 884) (2008).

In this case, the evidence does not show that the officers "used fear, intimidation, threat of physical punishment, or lengthy detention to obtain the consent." *Cuaresma*, 292 Ga. App. at 47 (2). Both the officer and Kendrick conducted themselves calmly. Nor does Kendrick argue that youth, lack of education, or low intelligence somehow negated the voluntariness of her consent. Rather, the crux of

7

her argument appears to be that she felt coerced into giving consent because she was not informed of her constitutional right against unreasonable searches and seizures and because the language of the implied consent notice, when read to her while she was arrested and in handcuffs, made her feel as though she did not have a choice but to acquiesce.[3]

The Supreme Court of the United States and other courts have rejected invitations to create a duty to inform suspects of their constitutional right against unreasonable searches and seizures, and we will not depart from their well-worn path. *See Schneckloth*, 412 U.S. at 231 (II) (B) (such a suggestion "has been almost

---

[3] Kendrick's brief on appeal could be construed as also challenging the implied consent statute as unconstitutional in that the language the statute requires officers to read is inherently coercive. If this appeal presented such a question, we would lack jurisdiction and would be required to transfer the case to the Supreme Court. It does not, however, because Kendrick did not directly challenge the constitutionality of the statute below and the trial court did not rule on it. Therefore, we can neither transfer the matter nor rule on constitutionality of the statute. *City of Decatur v. DeKalb County*, 284 Ga. 434, 436-38 (1), (2) (668 SE2d 247) (2008). We also observe that our Supreme Court has previously upheld the implied consent statute against a challenge much like Kendrick's. *See Klink v. State*, 272 Ga. 605, 606 (1) (533 SE2d 92) (2000). Although subsequent development of the law may have substantially eroded *Klink*'s analytical foundation, *compare Klink*, 272 Ga. at 606 (holding based in part on observation that "[t]he right to refuse to submit to state administered testing is not a constitutional right, but one created by the legislature") *with Williams*, 296 Ga. at 819-20 (holding Fourth Amendment requires actual consent in absence of warrant or other exceptions to warrant requirement), it remains binding on us until overturned by the Supreme Court.

8

universally repudiated by both federal and state courts, and we think, rightly so")
(footnotes and citations omitted). Moreover, in analyzing other challenges regarding
implied consent, we have found circumstances under which officers merely inform
a suspect of "the permissible range of sanctions that the state may ultimately be
authorized to impose" under the implied consent statute, as appears to have been done
here, not to constitute coercion. *See Gutierrez v. State*, 228 Ga. App. 458, 460 (2)
(491 SE2d 898) (1997) (citation and internal punctuation omitted). Nor does the fact
that Kendrick was in handcuffs negate her ability to give consent. *See Silverio v.
State*, 306 Ga. App. 438, 446 (3) (702 SE2d 717) (2010).

We are unpersuaded by the cases Kendrick cites in support of her argument that
her affirmative response to the implied consent notice was merely an acquiescence
to authority. In each of those cases, the suspects were not presented with a choice, and
the officers made clear that the "search" was going to occur regardless of their
consent. *See, e.g.*, *Hollenback*, 289 Ga. App. at 519 (officer informed suspect he was
going to search vehicle before she would be allowed to drive it away); *Cuaresma*, 292
Ga. App. at 44, 47 (2) (officer told suspect to either consent or he would call a dog,
and generally behaved in an intimidating, harassing, and threatening manner);
*Fulghum*, 261 Ga. App. at 595 (2) (officer told defendant that he needed to enter and

9

search the residence); *State v. Harris*, 236 Ga. App. 525, 529 (2) (b) (ii) (513 SE2d 1) (1999) (when officer asked suspect "would she empty the purse" and suspect complied silently, we held that "Silence in the face of a request for permission to search may sometimes be interpreted as acquiescence, but such acquiescence cannot substitute for free consent."). But here, the implied consent notice accurately recites Georgia law as contained within OCGA § 40-5-67.1(b)(2) and informs the suspect of her choice of either agreeing or refusing to submit to chemical testing, and the possible consequences for each choice. OCGA § 40-5-67.1(b)(2). In response to that notice, Kendrick responded an affirmative "yes."

Kendrick argues that "[c]onsent under the implied consent statute does not per se equal consent for Fourth Amendment purposes." This is correct. However, Kendrick also argues that in "*Williams v. State*, the Georgia Supreme Court clearly ruled that in order for a compelled search of a person's bodily substances to comply with the Fourth Amendment to the United States Constitution, the state must show more than just mere consent under Georgia's Implied Consent Statute." This is not a correct characterization of *Williams*. *Williams* held that the State's proof only of an affirmative answer to the question posed by the implied consent language, standing alone and regardless of what other facts may exist, is not sufficient to prove actual

and voluntary consent because it fails to consider the totality of the circumstances.[4]

*Williams*, 296 Ga. at 822-23. But we do not read *Williams'* rejection of a per se rule of consent under the implied consent statute as authorizing us to replace it with its opposite - that is, a per se rule that the State must always show more than consent under the implied consent statute. Rather, we take the Supreme Court at its word when it instructed trial courts to review the totality of the circumstances in determining consent.

An affirmative response to the question posed by the implied consent language may be sufficient for a trial court to find actual consent, absent reason to believe the response was involuntary. Here, Kendrick gave an affirmative answer to the question posed by the implied consent language, which is necessarily part of the circumstances to be considered by the trial court. She did not attempt to change that answer during

---

[4]*Williams* is not a case about the facts, but rather is about the standard that the trial court is to apply. In *Williams*, the trial court concluded that the implied consent statute, "in and of itself," constituted an exception to the Fourth Amendment; accordingly, the trial court did not look beyond compliance with the statute in denying Williams' motion to suppress. *Williams*, 296 Ga. at 819. The Supreme Court disagreed and held that the trial court's error was its "fail[ure] to address whether Williams gave actual consent to the procuring and testing of his blood, which would require the determination of the voluntariness of the consent under the totality of the circumstances." *Id.* at 823. The Court did not discuss the facts or any possible result of the trial court's future application of the correct test, leaving that for the trial court to do upon remand.

11

the time that elapsed before testing. *See Ware v. State*, 309 Ga. App. 426, 428 (710 SE2d 627) (2011) ("once voluntary consent is legally obtained, it continues until it either is revoked or withdrawn"). She did not appear so impaired that she was unable to understand what she was being asked,[5] she did not express any objection to the test, and the officer did not force her to take the test. *Compare Cuaresma*, 292 Ga. App. at 44, 47 (2); *Fulghum*, 261 Ga. App. at 595-96 (2). During the hearing on her motion to suppress, although Kendrick testified that she thought the breath test was mandatory, she also said that her decision to submit to testing was motivated, at least in part, by a desire to keep her license, a recognition of the actual choice she had. *See, e.g.*, *State v. Modlin*, 291 Neb. 660, 674-675 (867 NW2d 609) (2015) (noting that although the legal consequences of an administrative license revocation make refusal of a chemical test a difficult choice to make, "the difficulty of such choice does not render consent involuntary"). On this record, and considering all of the facts before us, and affording appropriate deference to the trial court that heard the testimony first-hand, we affirm.[6]

---

[5]We express no opinion as to what significance greater impairment might have had for this question.

[6]We do not approve the trial court's language in granting the order based in any part on finding a license to be a "privilege" rather than a "right." "[R]elevant

12

*Judgment affirmed. Dillard and McFadden, JJ., concur.*



constitutional restraints limit state power to terminate an entitlement whether the entitlement is denominated a 'right' or a 'privilege.'" *State v. Callaway*, 236 Ga. 613, 614 (1) (225 SE2d 230) (1976).